SO ORDERED: January 18, 2008.

_____
**Basil H. Lorch III
United States Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
## EVANSVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Consolidated for Administration |
| | ) | as Case No. 06-70378 |
| BRONCO HAZELTON CO., | ) | |
| WHITE RIVER COAL, INC., | ) | Bankruptcy Nos. 06-70375 |
| HAZELTON MINING, LLC., | ) | through 06-70379 |
| HAZELTON WASH PLANT, LLC., | ) | |
| BRONCO HOLDINGS I, INC., | ) | Chapter 11 |
| Debtors. | ) | |

## ORDER

This matter came before the Court in the above referenced debtors' ("Debtors") bankruptcy cases on: 1) Bill Nash and Tim Kerr's Motion for Order Directing Debtors to Pay Royalty Payments ("Nash & Kerr Motion"); 2) Motion for Order Directing Debtors to Pay Over-Ride Royalty Obligations ("Blankenberger Motion"); 3) Joinder in Motion for Order Directing Debtors to Pay Over-Ride Royalty Obligations ("Pieper Motion"); and 4) David C. Olliver's Reply in Support of Joinder in Motion for Order Directing Debtors to Pay Over-Ride and Royalty Obligations ("Olliver Motion") (collectively "Royalty Claims"). The Court is only considering the Royalty Claim

movants' (collectively the "Royalty Claimants") requests for the allowance of administrative expense priority under 11 U.S.C. § 503(b)(1) and is not addressing in this opinion either the amount or existence of the underlying claims themselves.

The Court conducted hearings on the Royalty Claims on March 23, 2007 and April 2, 2007 (collectively the "Hearings") at which time the parties submitted their evidence concerning the Royalty Claims. After reviewing the pleadings, the evidence presented at the Hearings and the proposed findings of fact and conclusions of law submitted by the parties, the Court finds that the Royalty Claimants are entitled to 11 U.S.C. § 503(b)(1) administrative expense priority on their Royalty Claims for the reasons detailed below.

FINDINGS OF FACT

**a. General Background**

1. Between 1989 and 1991 Atlas Minerals Inc. ("Atlas") entered into various leases with landowners (collectively the "Landlords") relating to the mining of coal on the Landlords' property (collectively the "Atlas Leases"). From 1991 to 2004, the Debtors entered into other leases with Landlords related to the mining of coal (collectively the "Non-Atlas Leases") (collectively the Atlas and Non-Atlas Leases are hereinafter referred to as "Coal Leases").

2. On or about September 28, 1995, White River Coal, Inc. ("White River"), one of the Debtors, entered into a Coal Lease Assignment and Coal Marketing Agreement with Atlas, ("Assignment Agreement") which assigned all of Atlas' interest in the Atlas Leases to White River.

3. Under the Assignment Agreement, White River agreed to assume Atlas' performance obligations under the Atlas Leases (Assignment Agreement, ¶ 1). The Assignment Agreement also stated:

> The Leases and the mining of coal thereunder shall be subject to the payment of an overriding royalty in the amount of twenty-five cents (25¢) per ton as follows: ten cents (10¢) per ton to Walter J. Pieper; ten cents (10¢) per ton to William L. Koester; and five cents (5¢) per ton to David C. Olliver. Atlas agrees to provide a written agreement relating to the overriding royalty, signed by Walter J. Pieper, William L. Koester and David C. Olliver, prior to October 30, 1995 ("Atlas Override Royalty").

4. There is no evidence, other than this reference in the Assignment Agreement, that a written agreement for the payment of the Atlas Override Royalties was ever entered into between William Koester ("Koester"), Walter J. Pieper ("Pieper"), and David Olliver ("Olliver") and either Atlas or the Debtors. Nevertheless, White River did, in fact, pay the Overriding Royalties as required by the foregoing Assignment Agreement from 1995 through February, 2006.

5. The Assignment Agreement, at ¶ 2, further provided that:

> Following a bona fide sale to a third party to whom or for which White River assigns and transfers this Agreement, the transferee shall be responsible for all of the performance obligations thereunder;

6. On November 27, 1995, a "Memorandum for Recording of Coal Lease Assignment and Coal Marketing Agreement" ("Lease Assignment Memorandum") was filed in Gibson County Indiana Real Property Records. The Lease Assignment Memorandum did not refer to any override royalties but did provide notice of the contractual relationship which was created between Atlas and White River by virtue of the Assignment Agreement.

### b. Blankenberger, Pieper and Olliver Motions Background

7. As noted above, Pieper and Olliver's claims are founded on the Atlas Override Royalties referred to in the Assignment Agreement.

8. In 1999, Atlas and White River entered into a series of loan transactions whereby Atlas borrowed a total of $250,000 from White River (the "Atlas Debt").

3

9. The Atlas Debt was secured by a Conditional Assignment of the Assignment Agreement.

10. The Atlas Debt was subsequently restructured through another series of transactions involving Atlas, White River, Pieper, the Blankenbergers, and a newly formed entity, NRG Trading & Supply, Inc. ("NRG"). After the restructuring, the Atlas Debt was retired and NRG and Pieper owed the Blankenbergers $250,000 (the "NRG Debts").

11. To secure the repayment of the NRG Debts, Atlas signed an Amended and Restated Conditional Assignment of Coal Lease Assignment and Coal Marketing Agreement (the "Conditional Assignment").

12. Pursuant to the terms of the Conditional Assignment, if there was a default on the NRG Debts, the Blankenbergers were authorized to have the Pieper Overriding Royalties paid directly to them until the NRG Debts were paid off.

13. Atlas and White River recorded various documents in the Office of the Recorder of the Gibson County, Indiana, in reference to the Atlas Debt and the subsequent NRG Debts (collectively referred to as the "1999 Recorded Documents").

14. On or about March 26, 2002, Atlas and White River recorded a Memorandum of Recording of Amended Conditional Assignment of Coal Leases Assignment and Coal Marketing Agreement in the Office of the Recorder of Gibson County, Indiana, (the "2002 Recorded Memorandum") which states:

> . . . the parties hereto do hereby execute and deliver this memorandum of agreement for the purpose of recording and giving notice that Atlas has conditionally assigned, and amended its conditional assignment of its rights, title and interest as collateral security to and for the benefit of White River, subject to the terms, provision and conditions of the Amended and Restated Conditional

4

>> Assignment of Coal Lease Assignment and Coal Marketing Agreement, . . .

15. After the documents creating the NRG Debts were signed, a default occurred, and as a result, the Blankenbergers asserted their rights under the Conditional Assignment and began to have the Pieper Overriding Royalties paid directly to them to apply toward the amount still owed under the NRG Debts.

16. The Blankenbergers received payment of the Pieper Overriding Royalties on Piepers' behalf from the Debtors until March, 2006.

17. The Blankenbergers are not claiming ownership of the Pieper Overriding Royalties, but are merely asserting their rights to continue to receive the Pieper Overriding Royalties under the Conditional Assignment until the NRG Debts are paid in full. Afterward, Pieper would be entitled to receive the Overriding Royalties.

18. At no time did Pieper or Olliver transfer or convey the Overriding Royalties reserved in the Atlas Agreement to White River or any of the other Debtors, nor did White River or any of the other Debtors ever hold title to the Overriding Royalties.

### c. Nash & Kerr Motion Background

19. On or about September 29, 1995, Bill Nash ("Nash") entered into an Employment Agreement with White River, with one of the Debtors ("Nash Employment Agreement").

20. Under paragraph 4 of the Nash Employment Agreement, Nash was entitled to a ten (10) cent per ton royalty from all coal mined from the Hazelton Mine as compensation under the Nash Employment Agreement.

21. Nash did not make any filings relating to the Nash Employment Agreement in the Gibson County Indiana Real Property Records.

22.     Sometime in December, 2005, Timothy J. Kerr ("Kerr") entered into a Royalty Agreement ("Kerr Agreement") with Hazleton Mining Company, LLC, one of the Debtors, for services previously provided "in relation to the development of coal properties included within the Hazleton Mining Company properties." Under the Kerr Agreement, Hazleton Mining Company LLC was to pay Kerr five (5) cents per ton of coal mined and sold by the Debtors.

23.     Kerr did not make any filings relating to the Kerr Agreement in the Gibson County Indiana Real Property Records.

### d. The Filing of the Bankruptcy and Assumption of Leases

24.     On July 1, 2005, Bronco Hazelton Co., one of the Debtors, entered into an acquisition agreement for the purchase of Hazleton Mine from the mine owners (the "Acquisition Agreement").

25.     On December 29, 2005, Bronco Hazelton Co. purchased Hazleton Mine under the terms of the Acquisition Agreement and several related addenda.

26.     On May 22, 2006, each of the Debtors filed with the United States Bankruptcy Court for the Southern District of Indiana, Evansville Division (the "Court"), its respective voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. as amended (the "Bankruptcy Code") commencing these Chapter 11 Cases. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

27.     On September 20, 2006, the Debtors filed a joint motion to assume three of the Atlas Leases ("Sanders Lease Motion"). The Motion was properly noticed to the Master Service List in the Debtors' Chapter 11 case. No Objection to the Sanders Lease Motion was filed by any party to this case and on October 18, 2007, the Sanders Lease Motion was granted by Order of this Court.

28.     On November 21, 2006, the Debtors filed their Motion to Assume Non-Residential Unexpired Leases ("Coal Lease Motion").  Under the Coal Lease Motion, the Debtors sought authorization to assume the Coal Leases, other than the leases assumed under the Sanders Lease Motion.

29.     The Coal Lease Motion was properly noticed to the Master Service List in the Debtors' Chapter 11 cases.  No Objection to the Coal Lease motion was filed by any party to this case and on December 18, 2006, the Coal Lease Motion was granted by Order of this Court.

30.     On January 30, 2007, after the Debtors assumed the Leases, the Blankenbergers filed a Motion seeking an Order from the Court directing Debtors to pay the Overriding Royalties as an Administrative Expense.  On that same date, Nash and Kerr filed a Motion seeking to have the Nash and Kerr Overriding Royalties paid as an Administrative Expense.  The Movants proffered several theories in support of their claim for administrative priority, only one of which will be discussed hereinbelow.

31.     Pieper and Olliver subsequently joined in the Blankenbergers' Motion.

32.     The Debtors, Standard Bank, and the Unsecured Creditors Committee objected to the Motions arguing that the Overriding Royalties are either (1) fully executed contract which gives rise to only an unsecured, prepetition debt, or (2) an executory contract which is subject to rejection by the Debtors.

## CONCLUSIONS OF LAW

### a. The Debtors Assumed the Obligation to Pay Overriding Royalties When They Assumed the Leases

1.      The law is clear that an overriding royalty is not a free standing interest, but, rather an interest which is carved out of, and constitutes a part of the underlying lease.  *See, In re GHR*

7

*Energy Corp.*, 972 F.2d 96, 99 (5th Cir. 1992) ("the term 'overriding royalty' has a well defined meaning in Texas. It is an interest which is carved out of and constitutes a part of, the working interest created by an oil and gas lease."); *see also, Grynberg v. Waltman*, 946 P.2d 473, 476 (Colo. App. 1996) ("An overriding royalty interest is not a freestanding interest. It is carved out of, and constitutes part of, the working interest created by an oil and gas lease, and is limited in duration to the life of the leasehold interest."); *AEC Industries, LLC v. Survivor Oil, Inc.*, 7 P.3d 1052, 1054 (Colo. App. 2000) ("Because it is a non-cooperating interest carved out of the lease, an overriding royalty has been regarded as an encumbrance on the working interest and is therefore free from liens thereafter imposed on the working interest."); *Piamco, Inc. v. Shell Oil Co.*, 799 F.2d 262, 264 (7th Cir. 1986) ("There can be no doubt that as a general matter overriding royalty obligations end with the termination of the estate from which their interests were carved, absent an express contracted provision to the contrary.").

    2.    Because an overriding royalty constitutes part of the working interest created by a lease, the fate of an overriding royalty is inextricably intertwined with that of the underlying lease. This interdependent relationship between an overriding royalty and its correspondent lease is explained in one of the leading treatises on Oil and Gas as follows:

> An outstanding characteristic of [an] overriding royalty is that its duration is limited by the duration of the lease under which it is created. Thus, when A, the lessee of Blackacre, assigns the lease to B, reserving a 1/16 overriding royalty, the continued existence of his interest depends on the acts of B in keeping the lease alive, by paying delay rentals, providing oil before the expiration of the primary terms, etc. Unless expressed, there is no duty by B to keep the lease and override alive. Nor does A have any power, apart from express agreement, to keep the lease and override alive. There may, however, be a duty to use good faith in determining whether to let the lease expire.

*See,* William & Myers, Oil & Gas Law 863(1991)(citations omitted).

    3.    In sum, an overriding royalty is part and parcel of a mineral lease and does not have

a life independent from the mineral lease. Hence, the mineral lease and related overriding royalty require that the two stand or fall together if they are subjected to the provisions of § 365.

4. It is well established that an executory contract must be assumed or rejected in its entirety. *Stewart Title Guaranty Co. v. Old Republic Nat. Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996). A debtor in possession takes the debtor's contracts *cum onere*, that is, subject to the existing burdens and cannot accept the benefit of an executory contract without accepting the burdens as well. *Matter of Chicago, Rock Island, and Pacific R. Co.*, 860 F.2d 267, 272 (7th Cir. 1988). Where an executory contract contains several agreements, the debtor may not choose to reject some agreements within the contract and not others. *Stewart Title*, 83 F.3d at 741.

5. When accepting or rejecting an executory contract under § 365, integrated contracts must be taken together as one uniform agreement. *See, In re Braniff*, 118 B.R. 819, 844 (Bankr.M.D.Fla. 1989) ("[m]ultiple contract documents may form one uniform agreement."); *see also, In re Karfakis*, 162 B.R. 719, 725 (Bankr.E.D.Pa. 1993) ("The Court is persuaded by this body of law which suggests that two contracts which are essentially inseparable can be, and should be, viewed as single, indivisible agreements between the parties."). An executory contract must be assumed or rejected in total and will not be bifurcated into parts that will be rejected and those that will not. *In re Exide Technologies*, 340 B.R. 222, 228 (Bankr.D.Del. 2006). Consequently, all of the contracts that comprise an integrated agreement must be either assumed or rejected since they all make up one contract. *Id.*

6. In the instant case, the Debtors have unequivocally accepted and assumed all of the Leases and have reaped the financial benefit and opportunities attendant with continued mining of the coal under those leases. As noted in the Debtor's Motion to Assume Leases, the Leases are

9

"critical components of the Debtors mining operation" and "provided the Debtors with access to the coal supplies currently being mined as well as those which may be mined in the near future." (Debtors Motion to Assume Leases, section 8). To allow Debtors to take the benefits of the Leases but then strip away the obligations to pay the Overriding Royalties would ignore the fundamental nature of the relationship between leases and their coinciding royalties and violate the mandates of the *cum onere* rule.

### b. The Assignment Agreement Demonstrates that the Overriding Royalties are an Integral Part of the Leases

7.  In addition to the fact that by their very nature mineral leases and overriding royalties are inextricably tied together, the language in the Assignment Agreement itself unequivocally expresses a clear intent to integrate the obligation to pay the Overriding Royalties with the rights to mine the coal acquired under the Leases. Specifically, the terms of the Assignment Agreement specifically provide that:

> The Leases and mining of coal thereunder were specifically subject to the payment of the Overriding Royalties.
>
> Atlas was given the authority to verify that White River was paying the royalty payments due the various landowners under the Leases.
>
> Atlas was authorized to advance payments or otherwise perform under the Leases if White River was not in compliance with the terms of the Leases.
>
> White River was obligated to use its best efforts to permit, develop and place the Hazelton Project into production for the mining of coal, and was required to develop and implement the mining operations <u>in accordance with the provisions of the Leases</u>.(emphasis added.)
>
> White River could cancel the Atlas Agreement at any time after one year by reassigning the Leases back to Atlas.
>
> The Atlas Agreement was to terminate when the Leases terminated.

10

      If the Atlas Agreement was terminated as a result of any default by White River, White River was required to assign and transfer the Leases back to Atlas.

      8.    From the above clauses it is clear that the Assignment Agreement was intertwined with the Leases and demonstrates the interdependent nature of the rights, benefits, duties and obligations set forth in those obligations. This is not a case where Atlas simply transferred the Leases to White River in exchange for compensation, and then removed itself from the Hazelton Project altogether. Atlas and White River both had substantial ongoing rights, duties and obligations under the Leases and the Atlas Agreement, and each party remained bound to the other throughout the project. The interrelated nature of the Leases and the Atlas Agreement, and the ongoing rights and duties they imposed on both Atlas and White River are evidence of the parties' intent to treat the mining of the coal under the Leases and the obligations of White River under the Atlas Agreement, including the obligation to pay the Overriding Royalties, as one integrated transaction.

## CONCLUSION

As noted hereinabove, the Court has confined itself to the narrow issue of whether the Royalty Claims are entitled to priority as administrative expenses under 11 U.S.C. § 503(b)(1). Based upon the foregoing, the Court finds that the contracts giving rise to the Royalty Claims were assumed by the Debtors together with the Leases and, as such, the Debtors remain liable to the Royalty Claimants under those individual agreements. The Royalty Claims shall properly be classified as administrative expense claims under 11 U.S.C. § 503(b)(1).

###

Distribution to all counsel.